1
2
3
4
5

JONATHAN W. HUGHES (SBN: 186829)
jonathan.hughes@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA  94111
Telephone:  (415) 471-3100
Facsimile:   (415) 471-3400

6
7
8
9
10

JEFFREY B. MALTZMAN (SBN: 131758)
jeffreym@maltzmanpartners.com
MALTZMAN & PARTNERS, P.A.
681 Encinitas Boulevard, Suite 315
Encinitas, CA 92024
Telephone:  (760) 942-9880
Facsimile:   (760) 942-9882

11
12
13

Attorneys for Defendant PRINCESS CRUISE LINES, LTD.
(additional counsel on signature page)

14
15

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

16
17

KEVIN HACHINSKY and LESLIE
HACHINSKY,

18

Plaintiffs,

19

v.

20

PRINCESS CRUISE LINES, LTD.,

21

22

Defendant.

Case No. 2:20-CV-02963-RGK-SK
Action Filed:  March 30, 2020

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

Date: August 16, 2021
Time: 9:00 a.m.
Judge: Hon. R. Gary Klausner
Courtroom: 850

Magistrate: Hon. Steve Kim
Filed: July 6, 2021

23
24
25
26
27
28

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................1

BACKGROUND .............................................................................................1

A.    COVID-19's Discovery and Early Public Health Guidance .................1

B.    Princess Implemented Screening Measures for *Grand Princess* Based on CDC and WHO Guidance ........................................................3

C.    No COVID-19 Cases, or Suspect Cases, Were Detected on *Grand Princess*'s February 11 Voyage....................................................4

D.    Princess Implemented CDC Guidelines for *Grand Princess*'s February 21 Cruise ...........................................................................5

E.    COVID-19 Becomes a Global Pandemic After Disembarkation ..........7

LEGAL STANDARD ......................................................................................8

ARGUMENT..................................................................................................8

I.    There Is No Evidence Establishing that Princess Had Actual or Constructive Knowledge of a Risk-Creating Condition ..........................8

A.    A Cruise-Ship Owner Must Have Actual or Constructive Notice of the Specific Risk-Creating Condition to be Liable for Negligence............................................................................................8

B.    Princess Lacked Notice of Any Risk-Creating Conditions .................10

    1.    Princess Undisputedly Lacked Actual or Constructive Notice of the Presence of COVID-19 on *Grand Princess* .........11

    2.    Princess Provided Prompt Warnings to Passengers and Implemented All Measures Recommended by CDC .................13

    3.    None of Plaintiffs' Evidence Establishes Notice........................14

C.    Even if Princess Had Notice of a Specific Risk-Creating Condition, Princess Undisputedly Was Not Negligent........................18

D.    Plaintiffs' Theory Would Upend Maritime Commerce and More .......19

II.    Plaintiffs Cannot Obtain Punitive Damages ...........................................20

CONCLUSION..............................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................ 8

*Archer v. Carnival Corp. & PLC*,
2020 WL 7314847 (C.D. Cal. Nov. 25, 2020) ...................................... 8, 11, 12, 20

*Chamberlain v. Chandler*,
5 F. Cas. 413 (C.C.D. Mass. 1823) ........................................ 20

*Churchill v. F/V Fjord*,
892 F.2d 763 (9th Cir. 1988) ...................................................... 20

*Davis v. Cruise Operator, Inc.*,
2017 WL 3057610 (S.D. Fla. July 19, 2017) .................................... 10, 16

*Doe v. Miles Lab'ys, Inc., Cutter Lab'ys Div.*,
927 F.2d 187 (4th Cir. 1991) ...................................... 12, 15, 17, 18, 19, 20

*Francis v. MSC Cruises, S.A.*,
2020 WL 6816963 (11th Cir. Nov. 20, 2020) ...................................... 10

*Keefe v. Bahama Cruise Line, Inc.*,
867 F.2d 1318 (11th Cir. 1989) ...................................................... 8

*Kressly v. Oceania Cruises*,
718 F. App'x 870 (11th Cir. 2017) ................................................ 10

*McGuire v. The Golden Gate*,
16 F. Cas. 141 (C.C.N.D. Cal. 1856) ............................................ 20

*McKee v. Cutter Lab'ys, Inc.*,
866 F.2d 219 (6th Cir. 1989) ........................................................ 15, 18

*Monteleone v. Bahama Cruise Line, Inc.*,
838 F.2d 63 (2d Cir. 1988) ............................................................ 9

*Reming v. Holland Am. Line Inc.*,
662 F. App'x. 507 (9th Cir. 2016) ................................................ 9

*Saltzstine v. Princess Cruise Lines Ltd.*,
    2020 WL 8475998 (C.D. Cal. Oct. 23, 2020) ....................................... 10, 14, 15, 16

*Samuels v. Holland Am. Line-USA Inc.*,
    656 F.3d 948 (9th Cir. 2011) ............................................... 8, 9, 13, 16, 18

*Taiariol v. MSC Crociere S.A.*,
    677 F. App'x 599 (11th Cir. 2017).......................................................... 16

*The Dutra Grp. v. Batterton*,
    139 S. Ct. 2275 (2019)................................................................. 19, 20

*Tonelli v. NCL (Bahamas) Ltd.*,
    428 F. Supp. 3d 1313 (S.D. Fla. 2019)................................................. 9, 10, 16, 17

*Weiner v. Carnival Cruise Lines*,
    2012 WL 5199604 (S.D. Fla. Oct. 22, 2012) ......................................... 8

*Zaccone v. Am. Red Cross*,
    872 F. Supp. 457 (N.D. Ohio 1994) ....................................................... 18

**<u>Other Authorities</u>**

85 Fed. Reg. 16,628 ...................................................................... 7

Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5:4 (6th ed. 2020) ................. 19

**INTRODUCTION**

Shipowners are not insurers for their passengers: Their liability is not strict and requires actual or constructive knowledge of a specific risk-creating condition. Courts hold that a shipowner's knowledge must be particularized—not just to the risk that caused injury, but to the specific location where plaintiffs claim to have been injured. This case flies in the face of these principles. Plaintiffs fault Defendant Princess Cruise Lines, Ltd. for not preventing a COVID-19 outbreak on *Grand Princess* in February 2020. But the undisputed facts are that Princess had no knowledge that anyone infected or even suspected of being infected was on *Grand Princess*. The facts are also undisputed that Princess followed and in key ways exceeded guidance from the Centers for Disease Control and Prevention (CDC) on screening for and containing COVID-19. Plaintiffs' case reduces to the theory that Princess should have known *in February 2020* that CDC and other public health authorities were wrong about COVID-19, from how it could be detected and contained to whether it was already widely present and spreading in the community in the United States. Courts consistently reject hindsight-based theories of liability like those Plaintiffs embrace. So should this Court.

**BACKGROUND**

**A.     COVID-19's Discovery and Early Public Health Guidance**

On December 31, 2019, the World Health Organization (WHO) picked up a media statement from China's Wuhan Municipal Health Commission about cases of a pneumonia-like disease in Wuhan, China. (Tarling Decl., Ex. 1, at 1; Jerome Rep. 5, Hughes Decl., Ex. 1.) On January 9, WHO announced that a new coronavirus, SARS-CoV-2, was associated with this illness. (Tarling Decl. ¶ 10 & Ex. 2 at 1.) Operating with limited information, public authorities, including WHO and CDC, developed guidance to detect and prevent COVID's spread. (*Id.* ¶¶ 10, 12-16 & Exs. 3, 5-7.) This guidance reflected a belief that COVID-19 was contained in China and was principally spread by symptomatic persons. (*Id.* ¶¶ 12-13, 20-24; Jerome Rep.

1

9, Hughes Decl., Ex. 1.) CDC did not confirm the first U.S. case until January 21: a Washington resident who recently returned from Wuhan. (Tarling Decl. ¶ 22.) U.S. cases rose to five on January 26, but CDC emphasized that all were related to travel from Wuhan and immediate risk to Americans was low. (*Id.* ¶ 22.) CDC confirmed this approach in guidance issued on February 1, 2020 for identifying suspected cases of COVID-19. (Tarling Decl. ¶ 15 & Ex. 5.) Suspect cases required both (1) an epidemiological link from travel to China or close contact with a person known to have COVID-19, <u>and</u> (2) fever or symptoms of lower respiratory illness (e.g., cough or shortness of breath). (*Id.*) Symptoms *alone* were insufficient. (*Id.*)

Public health authorities updated their guidance, but through the sailing of *Grand Princess* adhered to the same principles requiring symptoms *plus* an epidemiological link. (Tarling Decl. ¶¶ 28, 34.) On February 10, for example, CDC issued Interim Guidance for cruise ships that again limited suspect cases of COVID-19 to those with symptoms "plus travel history in China or other known exposure at the time of embarkation." (*Id.* ¶ 16 & Ex. 6 at 2.) Likewise, CDC's February 12 guidance for evaluating and reporting "persons under investigation" (PUIs) for COVID-19 limited PUIs to individuals with both symptoms *and* travel in China or close contact with a confirmed case. (Nair Decl. ¶ 7 & Ex. A at 1-2.) None of this guidance advised widespread mask-wearing or social distancing, or use of temperature checks or other medical examinations to screen passengers. (Tarling Decl. ¶ 26; Goldmann Rep. 4, Hughes Decl., Ex. 2.) Indeed, as of February 11 and 21, CDC and WHO actively discouraged the public from wearing masks, which were reserved for health care providers, individuals with suspected or confirmed infections, and people in close contact with such individuals. (Goldmann Rep. 4, Hughes Decl., Ex. 2.) Nor did public health authorities discourage or restrict large gatherings: in February and even in March, people continued to pack into stadiums, concerts, classrooms, religious services, and airplanes. (*Id.* 4-5.) Nor did officials recommend testing of all passengers and crew, and indeed such universal testing would not have been possi-

DEFENDANT'S MEMO. OF PTS. & AUTHORITIES SUPP. MOT. SUMM. J.          2:20-CV-02963-RGK-SK

ble given the scarcity of point-of-care tests. (*Id.* at 7; Tarling Decl. ¶ 28.) As of the voyages here, there were almost no confirmed COVID-19 cases in the United States and all had travel links to China. (Tarling Decl. ¶¶ 21-22.) There was no known community spread in North America until after *Grand Princess* departed. (*Id.* ¶¶ 21-22.)

**B.**   **Princess Implemented Screening Measures for *Grand Princess* Based on CDC and WHO Guidance**

Plaintiffs were passengers on *Grand Princess*, one of multiple ships owned and operated by Defendant Princess Cruise Lines, for a cruise departing February 21, 2020. (FAC, ECF No. 30, ¶ 7.) *Grand Princess* sailed on back-to-back voyages departing San Francisco on February 11 and 21, 2020. (Nair Decl. ¶ 5.) Princess is an indirect subsidiary of Carnival Corporation, the parent of several operating cruise lines or "brands." (Haeflinger Decl. ¶ 3.) Carnival began monitoring COVID-19 following WHO reports from late December and early January. (*Id.* ¶ 6; Tarling Decl. ¶¶ 7-11.) Beginning January 23, Carnival issued Instructional Notices establishing policy to be adapted and implemented by each brand, including Princess, to implement CDC guidance and screen passengers for COVID-19 by asking about travel to China and certain flu-like symptoms. (Haeflinger Decl. ¶¶ 8-14 & Ex. 1; Tarling Decl. ¶ 25 & Ex. 8).)

Princess implemented this guidance for the February 11 and 21 voyages in multiple ways. (Tarling Decl. ¶¶ 25-35 & Ex. 9; Eaton Decl. ¶¶ 4-12.) First, Princess emailed passengers on both cruises that a new screening policy based on recent public health guidance would deny boarding and offer a full refund to any passenger traveling from or through mainland China, Macau, or Hong Kong. (O'Connor Decl. ¶¶ 2-6 & Exs. 1-2.) Passengers before the February 21 cruise were instructed that any false health reporting would result in immediate disembarkation at the next opportunity. (*Id.* Ex. 2.) Second, Princess checked passports of international passengers and crew to identify anyone who may have traveled from or through China,

3

Hong Kong, or Macau in the previous 14 days. (Tarling Decl. ¶ 25; Eaton Decl. ¶¶ 9-10.) Third, passengers and crew were required to fill out a health screening form inquiring about travel to a prohibited region or contact with an infected person. (Eaton Decl. ¶¶ 4-5, 11-12 & Ex. 1 at 6) Princess employed this CDC-based guidance for screening individuals boarding the February 11 and 21 *Grand Princess* cruises. (*Id.* ¶ 12.) Before adopting and implementing this boarding denial policy, Princess determined that other cruise lines and air carriers were not using additional forms of screening. (Tarling Decl. ¶ 26.) Moreover, Princess implemented these policies even before CDC issued its February Interim Guidance for Ships. (*Id.*) Princess's approach was even more protective than CDC's and WHO's because it denied boarding to anyone with travel history to China as well as Hong Kong or Macau, *regardless of symptoms*. (*Id.*; Eaton Decl. ¶¶ 10, 12 & Ex. 1 at 5-6.) Based on existing CDC data at the time, the known risk for COVID-19 at ports on *Grand Princess*'s itinerary was low. (Tarling Decl. ¶ 23.) This data continued to support the geographic containment strategy for COVID-19 that CDC and other public health authorities and Princess adopted. (*Id.* ¶¶ 23-25.)

## C. No COVID-19 Cases, or Suspect Cases, Were Detected on *Grand Princess*'s February 11 Voyage

During the February 11 cruise, several passengers and crew reported to medical staff with various flu-like symptoms. (Nair Decl. ¶¶ 7, 10-11, 14-16.) These individuals did not have CDC's required epidemiological link—travel to China or close contact with a confirmed COVID-19 case—and therefore were not suspected cases. (*Id.*; Goldmann Rep. 9-10, Hughes Decl., Ex. 2.) Neither CDC nor other medical professionals treated flu-like symptoms alone as indicative of COVID-19—a person exhibiting those symptoms alone, for example, could not even obtain a COVID-19 test. (Nair Decl. ¶ 11 & Ex. A at 2; Tarling Decl. ¶¶ 28-29; Goldmann Rep. 10, Hughes Decl., Ex. 2.) Rather, besides select patients in ICU settings, per-

sons were tested for COVID-19 only if they had certain symptoms *plus* the required epidemiological link. (Tarling Dep. 64:11-67:5, 99:3-101:5, Hughes Decl., Ex. 3.)

As required by company policy and CDC regulations, *Grand Princess* medical staff tracked persons with influenza-like illness (ILI). (Tarling Decl. ¶¶ 27-29; Nair Decl. ¶¶ 4-13.) *Grand Princess*'s senior doctor, Dr. Nadia Nair, noted the number of ILI cases was higher than normal, but did not meet the threshold for reporting to CDC as an "outbreak." (Nair Decl. ¶ 7 & Ex. B at 2.) Princess nonetheless strengthened sanitation procedures out of an abundance of caution. (*Id.* ¶¶ 7-8 & Ex. B at 1; Tarling Decl. ¶ 31.) Dr. Nair continued monitoring ILI cases; the numbers declined and never met the outbreak threshold. (Nair Decl. ¶ 9.) Dr. Nair was aware of and concerned about COVID-19 and followed CDC guidance for identifying COVID-19 cases. (*Id.* ¶¶ 7-9.) Under these criteria, no one on the first voyage was a confirmed or suspect case. (*Id.* ¶¶ 7-16; Tarling Decl. ¶¶ 30-33.)

### D.   Princess Implemented CDC Guidelines for *Grand Princess*'s February 21 Cruise

Under applicable government guidance, no individual boarding the February 21 voyage met the criteria for a suspected case of COVID-19. (Tarling Decl. ¶¶ 34-36; Goldmann Rep. 10, Hughes Decl., Ex. 2.) At the time, the very small number of confirmed cases in North America were either traced to recent travel to China or close contact with a confirmed case. (Tarling Decl. ¶¶ 17, 21 & Ex. 7 at 4.) The vast majority of confirmed cases worldwide were still in Asia. (*Id.* ¶ 17 & Ex. 7 at 1.)

Monitoring passengers and crew on the February 21 cruise, as required by CDC and company guidelines, *Grand Princess*'s medical staff determined that none met CDC criteria for suspect COVID-19 cases. (Nair Decl. ¶¶ 13-16; Tarling Decl. ¶¶ 34-36; Goldmann Rep. 9-10, Hughes Decl., Ex. 2.) On March 2, as *Grand Princess* was sailing from Hawaii to Mexico, CDC notified Princess and *Grand Princess* medical staff about reports of a possibly infected passenger from the previous sailing who disembarked before the February 21 sailing. (Nair Decl. ¶¶ 17-18 & Ex. F

5

at 3; Tarling Decl. ¶ 36 & Ex. 11 at 2-3.) Because the passenger did not develop symptoms until a week after disembarking, and based on the then-current under-standing of COVID-19's incubation period, it appeared likely that infection (if con-firmed) occurred after disembarkation. (Nair. Decl. ¶¶ 17-18; Tarling Decl. ¶ 36.) CDC advised that it was still working with local health authorities to find out miss-ing information in order to assess the risk, if any, for *Grand Princess* and that no ac-tion was required. (Tarling Decl. ¶ 36.) Princess maintained constant contact with CDC. (*Id.*) Even as CDC worked to assess any risk to *Grand Princess*, Princess's epidemiologist directed medical staff to identify crew that may have served the pas-senger, screen them for respiratory symptoms and fever, monitor their condition for several days, and isolate them immediately if they had experienced respiratory symptoms in the last 14 days. (Nair Decl. ¶ 18 & Ex. F at 1.)

On March 3, CDC informed Princess about a possible link between a different passenger on the February 11 cruise and COVID-19 cases in Northern California. (Nair Decl. ¶ 19; Tarling Decl. ¶ 37 & Ex. 12 at 1-2.) That day, Princess canceled the final port call and re-routed to San Francisco. (Tarling Decl. ¶ 38.) Early on March 4, Princess directed the 68 passengers from the prior sailing to isolate in their cabins. (*Id.*; Capraro Decl. ¶ 4 & Ex. 1.) Princess notified the other passengers that CDC was investigating COVID-19 cases in Northern California connected to the first voyage, and instructed anyone with respiratory symptoms at any time during the voyage to contact the medical center. (Capraro Decl. ¶ 6 & Ex. 2.) Crew were also notified about CDC's investigation, that the ship was raising its sanitation level, and that certain crew members were being isolated. (*Id.* ¶ 8 & Ex. 3; Tarling Decl. ¶ 38.) Finally, Princess notified passengers who had disembarked from the first voy-age about the possible COVID cluster. (O'Connor Decl. ¶ 9 & Ex. 3.) These notices, all sent early on March 4, were crafted based on input from CDC and at CDC's rec-ommendation. (Nair Decl. ¶ 21 & Ex. G; Tarling Decl. ¶ 38 & Ex. 13 at 1, Ex. 15.)

DEFENDANT'S MEMO. OF PTS. & AUTHORITIES SUPP. MOT. SUMM. J.          2:20-CV-02963-RGK-SK

Princess implemented enhanced sanitation procedures and began to cancel large public gatherings on *Grand Princess*. (Tarling Decl. ¶ 38; Saviss Decl. ¶¶ 4-6.)

On March 5, CDC advised Princess to isolate all passengers in their cabins, which they did. (Nair Decl. ¶ 22; Tarling Decl. ¶ 39 & Ex. 15 at 7, Ex. 16.) Shipboard medical staff began assisting CDC with testing passengers for COVID-19. (Nair Decl. ¶ 23 & Ex. H; Tarling Decl. ¶ 39.) On March 6, CDC informed Princess of the results: 19 crew and 2 passengers were positive. (Nair Decl. ¶ 24; Tarling Decl. ¶ 40.) CDC and state health authorities then took over in all meaningful respects to plan disembarkation and shoreside quarantine of *Grand Princess*. (Nair Decl. ¶¶ 25-26; Tarling Decl. ¶ 40.) On March 9, *Grand Princess* docked in Oakland, where CDC and state authorities disembarked passengers over several days. State officials managed the process and quarantine sites, including choosing precautionary measures to be implemented during disembarkation and the quarantine arrangements for passengers. (Nair Decl. ¶ 26.) Shipboard medical officials were limited to identifying groups of symptomatic passengers for disembarkation. (*Id.*)

**E.    COVID-19 Becomes a Global Pandemic After Disembarkation**

In the weeks following disembarkation, the world transformed. On March 11, 2020, WHO declared COVID-19 a pandemic. (Tarling Decl. ¶ 42.) On March 12, Princess announced a voluntary pause of operations (*id.* ¶ 41), and on March 14 CDC issued a "No Sail" Order prohibiting most operations of cruise ships subject to U.S. jurisdiction (85 Fed. Reg. 16,628). Yet, through mid-March, sports teams continued to pack stadiums with fans (Tarling Decl. ¶ 23), and there were many documented outbreaks in congregate settings ranging from restaurants to gyms to choir practices, some well into the summer (Jerome Rep. 11-12, Hughes Decl., Ex. 1; CDC, *COVID-19 Outbreak Among Attendees of an Exercise Facility—Chicago, Illinois, August-September 2020*, Request for Jud. Notice (RJN) Ex. 1.) Even as of March 30, WHO recommended that people not wear masks unless they had COVID-19 or were caring for someone ill. (Jerome Rep. 12, Hughes Decl., Ex. 1.)

# LEGAL STANDARD

"Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011). Summary judgment is warranted when the evidence is "'so one-sided that one party must prevail as a matter of law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

# ARGUMENT

## I. There Is No Evidence Establishing that Princess Had Actual or Constructive Knowledge of a Risk-Creating Condition

### A. A Cruise-Ship Owner Must Have Actual or Constructive Notice of the Specific Risk-Creating Condition to be Liable for Negligence

A cruise line "does not serve as an insurer to its passengers." *Archer v. Carnival Corp. & PLC*, 2020 WL 7314847, at *8 (C.D. Cal. Nov. 25, 2020) (quotation marks omitted). Nor can a cruise line be held liable for the mere failure to *foresee* harm. *Weiner v. Carnival Cruise Lines*, 2012 WL 5199604, at *2 (S.D. Fla. Oct. 22, 2012). Rather, "a carrier must have '*actual or constructive notice of the risk-creating condition*' before it can be held liable." *Samuels*, 656 F.3d at 953 (emphasis added) (quoting *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989)). Thus, a cruise line "must warn passengers only of those dangers that 'the cruise line knows or reasonably should have known,' and 'which are not apparent and obvious to the passenger.'" *Archer*, 2020 WL 7314847, at *8 (quoting *Weiner*, 2012 WL 5199604, at *2).[1] Courts in "cruise ship negligence case[s] rou-

---

[1] Courts apply a different standard when "the condition constituting the basis of the plaintiff's claim" is "unique to the maritime context." *Samuels*, 656 F.3d at 953. But even accidents involving passenger visits to beaches while a vessel is docked nearby are "not uniquely associated with maritime travel." *Id.* Accordingly, this Court has applied the ordinary standard of negligence, requiring specific knowledge of a risk-creating condition. *Archer*, 2020 WL 7314847, at *8. Given the untold number of outbreaks in settings ranging from gyms to choir practices (Jerome Rep. 11-12,

DEFENDANT'S MEMO. OF PTS. & AUTHORITIES SUPP. MOT. SUMM. J.                2:20-CV-02963-RGK-SK

tinely grant summary judgment in a defendant's favor when a plaintiff fails to adduce evidence on the issue of notice." *Tonelli v. NCL (Bahamas) Ltd.*, 428 F. Supp. 3d 1313, 1319 (S.D. Fla. 2019) (quotation marks omitted).

Knowledge—actual or constructive—must be proven at a specific level. Awareness of a *category* of harms that could injure passengers is insufficient. *Samuels*, 656 F.3d at 953-54. The carrier must have reason to know that the particular hazard was present where the injury occurred. *Id.* In *Samuels*, the Ninth Circuit held that a shipowner was not required to warn a cruise passenger injured by a wave while visiting a beach "of the dangers of associated with swimming there." *Id.* at 949. Although everyone knows that swimming at beaches can lead to injury—*i.e.*, that waves can injure swimmers when waves are present—the plaintiff introduced no "evidence … that Holland American knew or should have known *that the Pacific Ocean side of Lover's Beach* was so dangerous that it needed to warn passengers not to swim there." *Id.* at 953-54 (emphasis added). There was not "a single [prior] report" that any passenger who visited that location that year had been injured. *Id.* at 954. The shipowner lacked "actual []or constructive notice" as a matter of law. *Id.*

*Samuels* accords with an unbroken line of maritime precedent holding that knowledge must be specific to the risk, the time period, and—key here—the location of injury. Shipowners without knowledge of dangers at a particular plaza where a passenger falls on uneven pavement cannot be liable for the fall, even if they know about the risks of pavement generally or even in the region. *Reming v. Holland Am. Line Inc.*, 662 F. App'x 507, 509-10 (9th Cir. 2016). Shipowners without specific knowledge of the danger that someone would trip over a screw on a particular stairway cannot be liable for a passenger tripping and falling, even if they know that a screw sticking up on a stairway, *if* present, could create a risk of tripping. *Monteleo-*

---

Hughes Decl., Ex. 1; RJN, Ex. 1), *and the global pandemic that ensued*, there is no evidence that the presence and spread of COVID-19 is unique to maritime travel.

*ne v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 64-65 (2d Cir. 1988). Shipowners cannot be liable if they lack knowledge of adverse weather near a ship's location at the time of an accident, *Kressly v. Oceania Cruises*, 718 F. App'x 870, 872 (11th Cir. 2017), or lack knowledge of a hazard at the particular location where the plaintiff slipped, *Francis v. MSC Cruises, S.A.*, 853 F. App'x 512, 516-17 (11th Cir. 2020).

These principles apply specifically in cases alleging exposure to diseases. This Court previously dismissed claims alleging that a COVID-19 outbreak on *Diamond Princess* in East Asia in early February gave Princess notice that COVID-19 was on *Grand Princess* when it sailed in the United States. *Saltzstine v. Princess Cruise Lines Ltd.*, 2020 WL 8475998, at *3 (C.D. Cal. Oct. 23, 2020) ("no reason for Defendant to believe that its passengers had been exposed to coronavirus prior to disembarking on February 21, 2020"). Other courts agree: The shipowner must have knowledge of an outbreak on the particular ship. *See Davis v. Cruise Operator, Inc.*, 2017 WL 3057610, at *4 (S.D. Fla. July 19, 2017); *Tonelli*, 428 F. Supp. 3d at 1320. In *Tonelli*, for example, the defendant concededly had notice that allowing young children in pools increased the risk of transmission of diseases through urine or feces, but there was "no evidence that Defendant was on notice as to the danger presented specifically by salmonella from children wearing diapers" or "that Defendant was on notice that salmonella was otherwise present on board the *Escape*," the ship where the plaintiff claimed to have been infected. 428 F. Supp. 3d at 1320. "Without such evidence," the plaintiff could not establish "the requisite notice." *Id.*

### B.     Princess Lacked Notice of Any Risk-Creating Conditions

Plaintiffs assert two theories of negligence: (1) Princess was negligent in deciding to sail *Grand Princess* in light of COVID-19 (FAC ¶¶ 12-16); and (2) Princess was negligent in failing to contain or adequately warn about the COVID-19 outbreak on board (*id.* ¶ 20). The supposed risk for both theories is the presence of COVID-19 aboard *Grand Princess* at the time Plaintiffs sailed—Plaintiffs, after all, cannot recover unless they establish that they actually "contracted the sickness" and

1   "were injured by it." *Archer*, 2020 WL 7314847, at *7. Both theories fail.

2   **1.      Princess Undisputedly Lacked Actual or Constructive Notice**

3   **of the Presence of COVID-19 on *Grand Princess***

4   Plaintiffs' first theory fails because there is no evidence that Princess had ac-

5   tual or constructive knowledge about COVID-19's presence on *Grand Princess*. Ra-

6   ther, the evidence is undisputed that on both the February 11 and 21 voyages, Prin-

7   cess followed CDC guidance, which reflected a view that COVID-19 was largely

8   confined to certain places in East Asia. Carnival Corporation and plc relied on this

9   guidance in promulgating directives for its brands to implement when screening

10  passengers and crew. (*Supra* pp. 4-5; Haeflinger Decl. ¶¶ 8-14 & Ex. 1; Goldmann

11  Rep. 7, Hughes Decl., Ex. 2.) CDC guidance on which Carnival relied was con-

12  sistent with WHO and European authorities', and at the time was followed uniform-

13  ly by clinicians worldwide. (Tarling Decl. ¶¶ 24, 28; Tarling Dep. 100:17-101:5,

14  Hughes Decl., Ex. 3; Goldmann Rep. 7-9, Hughes Decl., Ex. 2.) Princess imple-

15  mented Carnival's CDC-based directives, warning passengers that boarding would

16  be denied if they had traveled from or through affected areas and that they would be

17  subject to pre-boarding health screening. (O'Connor Decl. ¶¶ 2-6 & Exs. 1-2.) Inter-

18  national passengers' passports were also screened for travel to prohibited regions in

19  Asia and passengers and crew were screened for the same travel to prohibited re-

20  gions and relevant symptoms. (Tarling Decl. ¶ 25; Eaton Decl. ¶¶ 4-5, 9-12.) Prin-

21  cess's approach was more protective than guidance from CDC and WHO—it denied

22  boarding to anyone with travel history to China, Hong Kong, or Macau, *regardless*

23  *of symptoms*. (Tarling Decl. ¶ 26; Eaton Decl. ¶¶ 10, 12 & Ex. 1 at 5-6, Ex. 2 at 1.)

24  The evidence is undisputed that no passengers or crew met these uniform cri-

25  teria, which were crafted by expert authorities for the specific purpose of detecting

26  cases of COVID-19. (Tarling Decl. ¶¶ 30-36; Goldmann Rep. 9-10, Hughes Decl.,

27  Ex. 2.) That undisputed evidence squarely forecloses a finding of "actual … notice"

28  that any individual aboard *Grand Princess* had COVID-19 when the vessel set sail

on February 11 or 21. *Archer*, 2020 WL 7314847, at *8.[2]

Nor could Plaintiffs establish that Princess somehow had *constructive* knowledge of COVID's presence on *Grand Princess*. Constructive knowledge is what a person "reasonably should have known." *Archer*, 2020 WL 7314847, at *8 (quotation marks omitted). Again, the very point of CDC's guidance was to identify suspected cases of COVID-19 (Tarling Decl. ¶ 15 & Ex. 5), and Princess undisputedly complied with that guidance. Thus, finding constructive knowledge of COVID-19 aboard *Grand Princess* would require finding it *unreasonable* to adhere to CDC's screening procedures—or, worse, that the use of government-formulated screening mechanisms proves knowledge of the very disease being screened for. That perverse theory fails. Courts hold that without evidence of knowledge of a particular risk exceeding that of public health authorities, defendants cannot be charged with constructive knowledge exceeding that of the authorities. For example, in cases brought in the wake of discoveries about HIV and AIDS, courts frequently granted summary judgment against plaintiffs in cases alleging a duty to warn of the risk that HIV could be transmitted through blood because plaintiffs could not show a "medical consensus" at the time "that AIDS was transmissible by blood." *Doe v. Miles Lab'ys, Inc., Cutter Lab'ys Div.*, 927 F.2d 187, 194 (4th Cir. 1991). Courts so held even though industry participants had a generalized "increased concern that AIDS may be [so] transmitted" and knew about "potential risk" of transmission. *Id.* The rationale is straightforward: When public health officials, the medical community,

---

[2] Although a passenger on February 20 reported to the ship medical center with respiratory symptoms (but no fever), the passenger was not a suspected COVID case under applicable guidance because the passenger had no travel history to China or exposure to a suspected or confirmed case. (Nair Decl. ¶¶ 10-12 & Ex. C.) Likewise, a crewmember who disembarked in Hawaii on February 29 after reporting flu-like symptoms lacked the necessary epidemiological link and had infections that seemed to explain a number of observed symptoms, including fever. (*Id.* ¶ 15 & Exs. D, E.) The crewmember tested negative for COVID-19 after disembarkation. (*Id.* ¶ 16.)

and businesses alike are struggling to reach consensus about the nature and risks of an emerging disease, and are screening for the disease using the best available information, it is not just legally impermissible but manifestly unfair to impose liability based on "hindsight opinions" that these entities should have known more or should have warned of all "possibl[e]" risks. *Id.*

The same principle forecloses relief here. Again, what matters is not whether Princess should have known about the *general presence* of COVID-19 in regions of the globe, or about COVID-19's potential risks *if* it found its way aboard a cruise ship. *Samuels*, 656 F.3d at 954. Plaintiffs need evidence supporting a conclusion that, despite the overwhelming public health consensus that COVID-19 was linked to a particular geographic region and that flu-like symptoms alone did not indicate a suspected case, Princess was required to ignore that consensus and to identify suspected cases of COVID-19 through other means. There is no such evidence.

### 2. Princess Provided Prompt Warnings to Passengers and Implemented All Measures Recommended by CDC

Plaintiffs allege that, once *Grand Princess* set sail, Princess failed to adequately notify passengers about the risk of COVID-19 aboard or to curtail its spread using unspecified protective measures. (FAC ¶ 20.) But the duties to warn and implement these measures require actual or constructive knowledge of the specific risk; there must be evidence that Princess knew or reasonably should have known that COVID was on the vessel at the time. *Samuels*, 656 F.3d at 953-54 (duty-to-warn liability requires proof of knowledge of specific risk). The evidence is that passengers and crew were monitored on board and *none* satisfied CDC criteria for a suspect case. (Nair Decl. ¶¶ 7-16; Tarling Decl. ¶¶ 30-36; Goldmann Rep. 10, Hughes Decl., Ex. 2.) And the evidence is undisputed that no guidance at the time recommended widespread mask-wearing, quarantining, or COVID-19 testing. (Tarling Decl. ¶ 26; Goldmann Rep. 4, Hughes Decl., Ex. 2.) Indeed, CDC and WHO discouraged the general public from wearing masks given their scarcity. (Goldmann

13

Rep. 4, Hughes Decl., Ex. 2.) Once Princess suspected COVID-19 aboard, the un-disputed facts are that Princess promptly—and with CDC's input—communicated what they knew to passengers, crew, and public health officials. (*Supra* pp. 7-8; Capraro Decl. ¶¶ 3-4, 6, 8 & Exs. 1-3; Tarling Decl. ¶ 38 & Exs. 13-15; Nair Decl. ¶ 21; O'Connor Decl. ¶ 9 & Ex. 3.) And it worked closely with CDC to mitigate risk and control the spread by implementing CDC-based protocols. (*Supra* pp. 8-9; Tar-ling Decl. ¶¶ 38-39; Saviss Decl. ¶¶ 4-6; Nair Decl. ¶¶ 22-23.) Plaintiffs' real com-plaint is that Princess did not foresee COVID-19's presence, which even if true can-not support liability under established law.

### 3.    None of Plaintiffs' Evidence Establishes Notice

***Public health guidance.*** No alert or guidance from public health authorities issued before the February 21 cruise establishes actual or constructive knowledge. (*See* Tarling Dep. 140:6-141:19, Hughes Decl., Ex. 3.) These sources provided only general information about COVID but did not provide actual or constructive knowledge of the specific risk. For example, the January 30 statement from the WHO Director-General declaring COVID-19 a "public health emergency of interna-tional concern" did "not recommend any travel or trade restriction based on the cur-rent information available" and highlighted that 99.9% of cases at the time had a di-rect link with China. (Tarling Decl. ¶ 14 & Ex. 4 at 2-3.) WHO's general determina-tion that COVID-19 posed international risk did not give rise to specific notice that COVID-19 was likely present on *Grand Princess* half a world away. *Saltzstine*, 2020 WL 8475998, at *3 (outbreak in Asia "could not have indicated to Defendant the need to implement more stringent safety protocols on the *Grand Princess*"). Again, at best, this type of source suggests foreseeability.

***Passenger and crewmember with flu-like symptoms on first sailing.*** The passenger who sailed on the February 11 sailing and reported to shipboard doctors with flu-like symptoms on February 20 did not provide actual or constructive knowledge of COVID's presence. (FAC ¶ 13.) Lacking recent travel in China or

contact with a known or suspected case of COVID-19, the passenger did *not* meet the criteria for a suspected case under CDC guidance. (Nair Decl. ¶¶ 10-12 & Ex. A at 1-2.) So too for the ill crewmember who disembarked on February 29 (FAC ¶ 20), who lacked CDC's necessary epidemiological link, had infections that seemed to explain observed symptoms, and tested negative for COVID on shore. (Nair Decl. ¶¶ 14-16 & Exs. D, E.) As this Court held: "knowledge that some passengers had COVID-19 symptoms is insufficient for Defendant to have been on notice that the ship had been contaminated with COVID-19." *Saltzstine*, 2020 WL 8475998, at *3. There is no evidence that in February Princess should have known that a person in the United States exhibiting flu-like symptoms without more likely had COVID-19, especially when CDC advised otherwise and would not even offer testing for such persons. (Tarling Decl. ¶¶ 28-29.). Holding otherwise would require holding that screening guidelines uniformly recommended by government authorities were unreasonably lax—a theory courts consistently reject. *See, e.g.*, *McKee v. Cutter Lab'ys, Inc.*, 866 F.2d 219, 224 (6th Cir. 1989); *Miles Lab'ys*, 927 F.2d at 194.

     ***Princess's warnings and precautionary measures***. Plaintiffs suggest that Princess's own statements and advisories reflect knowledge of a specific risk-creating condition that was not communicated to passengers. Their central allegation is that Princess on February 25 issued a warning to passengers from the February 11 sailing but neglected to send that warning to passengers on the second sailing. (FAC ¶ 21.) That allegation is simply untrue; Princess had no knowledge of any COVID cases related to *Grand Princess* at the time and, thus, sent no warning on February 25. (O'Connor Decl. ¶¶ 7-8.)  Plaintiffs also seem to suggest that Princess's advisories and precautionary measures implemented after learning of the presence of COVID-19 on the vessel proves notice that some (unspecified) further protective measures were necessary. (K. Hachinsky Ans. to Interrog. No. 8, Hughes Decl., Ex. 4.) But, again, Princess undisputedly *did* implement the measures recommended by CDC and others. Taking precautionary measures does not imply knowledge of a

more acute risk. *Taiariol v. MSC Crociere S.A.*, 677 F. App'x 599, 602 (11th Cir. 2017) ("the 'watch your step' sticker on the step does not raise an issue of fact as to whether the defendant had notice of the nosing's slippery condition").

    ***Diamond Princess*.** Plaintiffs rely on an outbreak on *Diamond Princess*, another vessel operated by Princess that had sailed in Asia. (FAC ¶¶ 17, 23.) That vessel departed from Yokohama, Japan on January 20 and disembarked a passenger on January 25 who tested positive for COVID-19 on February 1, leading to the vessel's return on February 3 to Yokohama, where it was quarantined by the Japanese government. (Tarling Decl. ¶ 18.) "The fact that a different ship, in another country, had experienced an outbreak could not have indicated to Defendant the need to implement more stringent safety protocols on the *Grand Princess*." *Saltzstine*, 2020 WL 8475998, at *3. Again, this is consistent with the principle that courts assessing disease outbreaks on cruise ships must evaluate notice on a vessel-by-vessel basis. *Davis*, 2017 WL 3057610, at *4; *Tonelli*, 428 F. Supp. 3d at 1320. And it accords with the undisputed facts in this case: given the understanding of COVID-19 as region-specific, there was no reason to believe that an outbreak on a vessel across the globe would replicate in North America, when there were *zero* known cases lacking that key epidemiological link. (Tarling Decl. ¶¶ 18-21 & Ex. 7.)[3]

    Even assuming *Diamond Princess* gave rise to notice regarding other vessels outside that geographic region, it is undisputed that the CDC and WHO had as much

---

[3] Although "evidence of [past] accidents that are substantially similar" can sometimes support the existence of constructive knowledge, courts consistently demand a very high degree of similarity between the two incidents to create a factual dispute. *Taiariol*, 677 F. App'x at 601 (past incidents of falling on stairways not substantially similar to tripping on particular object that caused plaintiff's fall); *see Samuels*, 656 F.3d at 954 (no constructive knowledge because no history of accidents at location where plaintiff injured). Otherwise, liability could be imposed based on a "general foreseeability theory of liability that has been roundly rejected by federal courts because it would essentially convert a carrier into an insurer." *Navarro v. Carnival Corp.*, 2020 WL 1307185, at *4 (S.D. Fla. March 19, 2020).

if not more knowledge as Princess about what transpired on the *Diamond Princess*. (Tarling Decl. ¶¶ 18-20.) Plaintiffs concede this, citing a February 18 CDC announcement of travel restrictions for passengers who had disembarked *Diamond Princess*. (FAC pp.3-4.) Yet these authorities did *not* advise vessels outside Asia to cease sailing, nor advise that passengers should be required to wear masks or social distance; rather, *Diamond Princess* reinforced the view that COVID-19 was limited geographically to China. (Tarling Decl. ¶ 18.) In fact, the final passengers were not disembarked from *Diamond Princess* by Japanese authorities until February 22, the day after the start of *Grand Princess*'s voyage at issue here. (*Id*. ¶ 19.) But because the Japanese government managed the shipboard quarantine, Princess had very little information about its strategy and efficacy. (*Id*.) And discussions with the Japanese government and other public health authorities regarding *Diamond Princess* resulted in a limited and still-evolving understanding about COVID-19's transmission. (*Id*. ¶ 20.) Following *Diamond Princess*, Princess continued to implement policies based on WHO and CDC guidance, even exceeding that guidance by denying boarding to all individuals with any epidemiological risk factors even if they had no symptoms. (*Id*.) Princess cannot be liable for declining to do more than public health authorities possessing as much or more information. *Miles Lab'ys*, 927 F.2d at 194.

   ***Information regarding risk of disease transmission on ships generally.*** Unable to identify knowledge specific to *Grand Princess*, Plaintiffs rely on the notion, supported only by inadmissible news articles published after the ship docked, that cruise ships generally are susceptible to disease outbreaks. (K. Hachinsky Ans. to Interrog. No. 1, Hughes Decl., Ex. 4.) Generalized notice about what happens *if* diseases are present is insufficient as a matter of law because it has nothing to do with whether the particular disease *was* present. *See Tonelli*, 428 F. Supp. 3d at 1320; *Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358 (11th Cir. 1993) (liability cannot be based on mere "creat[ion] or maintain[ance] [of] premises," without actual or constructive notice). CDC and other public health authorities knew about conditions

1    on cruise ships and yet, even after *Diamond Princess*, did not recommend against

2    sailing. Princess had no knowledge of a risk specific to *Grand Princess*.

3        **C.**    **Even if Princess Had Notice of a Specific Risk-Creating Condition,**

4                **Princess Undisputedly Was Not Negligent**

5           Plaintiffs also have no evidence that Princess failed to exercise "reasonable

6    care under the circumstances." *Samuels*, 656 F.3d at 953. Recognizing the unfair-

7    ness of liability based on hindsight, courts in cases involving new infectious diseas-

8    es consistently grant summary judgment when the undisputed facts show that the

9    defendant followed all government guidance applicable at the time. For example,

10   many individuals who contracted HIV through blood transfusions during the early

11   1980s sued laboratories, blood banks, hospitals, and others alleging that these enti-

12   ties had negligently supplied blood infected with HIV. *See, e.g.*, *McKee*, 866 F.2d at

13   220; *Miles Lab'ys*, 927 F.2d at 194; *Zaccone v. Am. Red Cross*, 872 F. Supp. 457,

14   458 (N.D. Ohio 1994). Plaintiffs claimed that those entities should have used mech-

15   anisms that would have more reliably excluded HIV-positive blood like antibody

16   tests or questioning about donors' sexual histories, *Zaccone*, 872 F. Supp. at 460-61,

17   processed blood in ways that kill the virus, *McKee*, 866 F.2d at 224, or warned

18   about the risk of transmission through blood, *Miles Lab'ys*, 927 F.2d at 194-95.

19          Courts routinely granted summary judgment for defendants on these claims.

20   In *McKee*, for example, a plaintiff who was infected before "the medical community

21   reached a consensus that AIDS could be transmitted by blood and that HIV was

22   identified as the AIDS-causing virus" relied on expert testimony stating that, with

23   existing technology, "Defendant *could have* heat treated or otherwise produced

24   [blood] to inactivate the AIDS virus." *Id.* at 224. The Sixth Circuit found no triable

25   issue of fact on that negligence claim. Notwithstanding "the tragic consequences of

26   AIDS for plaintiff, and for society," "hindsight opinions as to its possible preven-

27   tion, before the disease-causing virus and the efficacy of preventive measures were

28   discovered, are not sufficiently probative to preclude summary judgment." *Id.* The

Fourth Circuit agreed: "Hindsight opinions by appellant's experts suggesting that more should have been done to prevent the transmission of what was then and now remains an enigmatic disease are insufficient …." *Miles Lab'ys*, 927 F.2d at 193.

The same principle warrants summary judgment for Princess. *See* Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5:4 (6th ed. 2020) ("duly enacted laws, regulations, and rules" as well as "customs" are evidence of duty of care). Princess undisputedly adhered to government guidance in boarding passengers; screening for suspected cases; and responding to passengers' reporting of symptoms. Before adopting and implementing its boarding denial policy, Princess determined that others "in the industry," *Miles Lab'ys*, 927 F.3d at 193—cruise lines and air carriers specifically—were not using additional forms of screening. (Tarling Decl. ¶ 26.) Once COVID-19 was suspected aboard, Princess promptly re-routed to San Francisco and stayed in close communication with CDC as they worked to keep passengers safe until CDC took over and directed disembarkation and quarantine. Plaintiffs' attempt to establish liability in the face of this undisputed evidence boils down to portrayal of copious government guidance as *itself* unreasonable, which they can do only with the 20:20 vision of "hindsight." *Miles Lab'ys*, 927 F.2d at 193. That is precisely the effort courts in emerging-disease cases have rejected.

### D.   Plaintiffs' Theory Would Upend Maritime Commerce and More

The implications of Plaintiffs' arguments reinforce the principles of maritime law, and common sense, that support judgment. The Supreme Court has long recognized that "the protection of maritime commerce" is a "fundamental interest" of federal maritime jurisdiction and has cautioned against expansions of liability that "frustrate" this protective purpose. *The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2287 (2019) (quotation marks omitted). Under Plaintiffs' view, liability will extend to any shipowner that operates in the face of *any* risk whatsoever, no matter how slight and even if there is no evidence that the shipowner or operator knew that the risk was actually present for a particular ship. In a world where new infectious dis-

eases and variants are a reality, it would be impossible for businesses to operate without facing crippling liability, including punitive damages, for failing to predict outbreaks. The consequences would not be confined to novel infectious diseases: Under Plaintiffs' view, businesses must close in response to every theoretical danger customers might face, even without information that the danger threatens that particular business. Businesses that do not give up and shut down will have to issue nonstop "barrage[s]" of warnings about all the ways in which someone can "possibly" be injured—even without reason to believe those dangers are present. *Miles Lab'ys*, 927 F.2d at 194. Maritime law, and common sense, foreclose this outcome.

## II. Plaintiffs Cannot Obtain Punitive Damages

Even if this case proceeds, Plaintiffs cannot obtain punitive damages. *First*, punitive damages are categorically unavailable. There is no history in maritime law of awarding punitive damages where, as here, the defendant's conduct is no more than a failure to anticipate harm from a novel disease after following public health advice. *Batterton*, 139 S. Ct. at 2278. The small number of maritime cases awarding passengers such damages involved intentional if not criminal conduct. *See*, *e.g.*, *Chamberlain v. Chandler*, 5 F. Cas. 413 (C.C.D. Mass. 1823) (Story, J.) (permitting damages to "punish" shipowner where master's conduct to female passenger included "habitual obscenity, harsh threats, and immodest conduct"); *McGuire v. The Golden Gate*, 16 F. Cas. 141 (C.C.N.D. Cal. 1856) (ship's master transported passenger against his will to Hawaii at behest of vigilante group). Nothing in Princess's conduct comes close. *Second*, because Princess followed current public health advice, there is no evidence that Princess's conduct "demonstrates a 'reckless or callous disregard' for the rights of others" or "shows 'gross negligence or actual malice or criminal indifference.'" *Archer*, 2020 WL 7314847, at *9 (quoting *Churchill v. F/V Fjord*, 892 F.2d 763, 772 (9th Cir. 1988)).

### CONCLUSION

The Court should grant judgment in favor of Princess.

DATED: July 6, 2021                    ARNOLD & PORTER
                                       KAYE SCHOLER LLP

                               By:  *s/ Jonathan W. Hughes*
                                       Jonathan W. Hughes (SBN: 186829)
                                       777 South Figueroa Street, 44th Floor
                                       Los Angeles, CA 90017
                                       Tel.: (213) 243-4000
                                       Fax: (213) 243-5999

                                       Katie J.L. Scott (SBN: 233171)
                                       katie.scott@arnoldporter.com
                                       3000 El Camino Real
                                       5 Palo Alto Sq., Suite 500
                                       Palo Alto, CA 94022
                                       Tel.: (650) 319-4500
                                       Fax: (650) 319-4700


                                       MALTZMAN & PARTNERS, PA

                                       *s/ Jeffrey B. Maltzman*
                                       Jeffrey B. Maltzman (SBN: 131758)
                                       Rafaela P. Castells (SBN: 290828)
                                       Edgar R. Nield (SBN: 135018)
                                       Gabrielle De Santis Nield (SBN: 110930)
                                       681 Encinitas Blvd., Suite 315
                                       Encinitas, CA 92024
                                       Tel.: (760) 942-9880
                                       Facsimile: (760) 942-9882
                                       jeffreym@maltzmanpartners.com
                                       edn@maltzmanpartners.com
                                       gabn@maltzmanpartners.com
                                       rafaelac@maltzmanpartners.com

                                       *Attorneys for Defendant*
                                       *Princess Cruise Lines, Ltd.*

21